Hillsborough, }
March 6, 1934. }

NATHAN A. TIRRELL *v.* FRANCIS W. JOHNSTON & *a.*

*Samuel A. Margolis* (by brief and orally), for the plaintiff.

*Francis W. Johnston,* attorney-general, and *H. Thornton Lorimer,* assistant attorney-general (*Mr. Lorimer* orally), for the defendants.

PEASLEE, C. J. The procedural question raised by doubts as to the availability of the equitable remedy by injunction need not be considered. If that remedy is not available, the case is clearly one where proceedings under the declaratory judgment act (Laws 1929, *c.* 86) may be taken. *Burghes* v. *Attorney-General,* [1911] 1 K. B. 139, quoted with approval in *Faulkner* v. *Keene,* 85 N. H. 147, 154.

It was agreed at the argument that there will be no occasion for the issuance of an injunction in any event. When the law is settled it will be obeyed. It is therefore immaterial whether the proper proceeding is an application for a restraining order or a petition for a declaratory judgment. A final interpretation of the law in either form of proceeding would be binding upon these parties.

Following the practice in this jurisdiction, we therefore proceed to a consideration of the merits of the controversy, without further attention to what are here deemed to be inconsequential matters of form.

The state's case is put upon two grounds: I. That the charge is not a tax, but a payment required for the use of facilities which the state

may furnish or not as it sees fit.  II. That if it were to be treated as a tax, it is not laid upon an instrumentality of the federal government.

Upon both propositions the state must rely upon the federal view of the law.  It is now elementary that upon all questions touching federal power and federal exemptions from state interference the decisions of the federal supreme court control.  Where there is such a decision of a question, directly in point in a litigated case, it is not the function of a state court to inquire into the nature or soundness of the reasoning by which the federal conclusion was supported.  But where the federal decisions are not clearly applicable to the case in hand, it becomes necessary for the state court, charged with the duty of attempting to solve the problem of federal law, to examine the ground work of the federal decisions which are thought to have value as indicating the probable federal position, if the problem in hand were before the federal court for decision.  *Campbell* v. *Corporation, ante,* 310, and cases cited.

In such a situation it is the duty of the state court not merely to consider the fact that certain reasons have been given in the federal decisions.  In order to adequately appraise the probable future course of federal law, it is essential to inquire into the soundness of the reasoning used in earlier cases which bears to some degree upon the question in hand; for if those reasons appear to be unsound or inadequate these infirmities afford ground for an inference that the decisions based thereon will not be extended to cover new and distinguishable situations.

It is conceded by both parties to the present controversy that there is no federal authority directly in point.  Each seeks to support his position by inferences drawn from the decided cases.  It therefore becomes necessary to examine somewhat critically these sources of federal law.

I. The state's first position is that the charge here involved is not a tax, but, in substance, a recompense exacted for the use of the state's highways.  This is the New Hampshire law.  P. L., c. 104; *Opinion of the Justices,* 81 N. H. 552.

It is argued that the advice given to the house of representatives in the foregoing opinion is unsound, because the federal highway act provides that all roads aided by the general government shall be free from all tolls.  U. S. Code Title 23, s. 9.  The state having accepted the act (Laws 1917, c. 162; P. L., c. 88) and received aid thereunder, it is said that the state cannot charge for the use of its roads.

One answer which has been given to the above proposition is, that

as only a part of the roads in the state are federal aided, the state is free to act as to all the rest, and therefore may make a general charge for the promiscuous use of its roads, without offense to its federal obligation. *Cunningham* v. *Potts*, 9 Fed. Rep. (2d) 469.

A more satisfactory refutation of the argument is found in the opinion of Mr. Justice *Stone* in *Carley* v. *Snook*, 281 U. S. 66, 73, 74. In that case the complaining party alleged that certain automobile registration fees were tolls charged for the use of the highways and therefore could not be collected because of the stipulation in the federal highway act. Reliance was placed upon the earlier federal decision that "It is clearly within the discretion of the State to determine whether the compensation for the use of its highways by automobiles shall be determined by way of a fee, payable annually or semi-annually, or by a toll based on mileage, or otherwise." *Kane* v. *New Jersey*, 242 U. S. 160, 168.

The court, however, found no difficulty in recognizing that a charge might be in the nature of a toll, and still not be a toll which was prohibited by the federal road act. "The fact that they may have been held justified, in other connections, because of their similarity to 'tolls for the use of highways' affords no basis for saying that the present fees are prohibited tolls within the meaning of the Federal Highway Act."

The conclusion that the tolls referred to in the federal highway act as not chargeable for the use of federal aided roads are only those which are such in the stricter sense of that term was justified upon convincing, practical grounds. In speaking of the fees there charged it was said: "Such fees were a common form of state license tax before the Federal Highway Act was adopted in 1921. That act contemplated the continued maintenance by the States of state highways, constructed with federal aid, the expense of which must necessarily be defrayed from revenues derived from state taxation. It cannot be supposed that Congress intended to procure the abandonment by the states of this well recognized type of taxation without more explicit language than that prohibiting tolls found in § 9."

The proposition that the charge here laid is a toll prohibited by the federal act is clearly negatived by the decision just quoted. While the precise line of demarcation is not there described, the plain inference seems to be that the only charges which are prohibited are "tolls in the commonly accepted sense of a proprietor's charge for the passage over a highway or bridge, exacted when and as the privilege is exercised." *Carley* v. *Snook, supra*, 73. The charge laid by the statute is not forbidden by this federal law.

As before stated, it is the local law that the charge under consideration is in substance one made for the use of our highways, and therefore does not come within our constitutional inhibition against certain forms of taxation. *Opinion of the Justices*, 81 N. H. 552. In so far as the issue of validity under the state constitution is involved, the conclusion of the state court is final. *State* v. *Company*, 84 N. H. 322. There is no federal authority to review this feature of state decisions. 6 R. C. L. 85, 86. This, however, does not dispose of the issue presented when the validity of a state law is challenged upon the ground that the law infringes upon, or impairs the exercise of, federal functions. When such questions arise their final determination rests with the federal court.

In the examination of such state laws as relate to federal functions, the federal court is not bound by state decisions as to what the nature of the provisions under consideration may be. As to what is required thereby in the concrete sense of acts to be done or abstained from, the state interpretation is followed. That is, it is for the state to say what its laws are. "The decision of the state court is controlling as to the meaning and extent of the statutory requirements." *Hicklin* v. *Coney*, 290 U. S. 169, and cases cited. But as to their effect as bearing upon federal instrumentalities the federal view, both of results and as to the nature of the requirements, prevails. *Gregg Dyeing Co.* v. *Query*, 286 U. S. 472.

It follows in the present instance that the state law, that this charge is so far in the nature of a toll that it is unobjectionable under our constitution, cannot be challenged in the federal court. And although by federal law it is not a toll in the narrower sense of that term as used in the prohibitory section of the federal highway act, a further question remains for solution. Whether it is a proprietary charge which can be demanded of federal agencies, or on the other hand an act of sovereignty demanding a contribution to the support of local government, is an issue for federal determination. As it is answered one way or the other, the right so to demand the charge from a federal agency is to be determined.

The statutory description of the charge laid as a "road toll" (P. L., c. 104, s. 4), does not settle the question of its character. "We are not concerned with what the tax is called, but with what the statute does." *Hughes*, C. J. in *Gregg Dyeing Co.* v. *Query*, 286 U. S. 472, 478. On the other hand, the provision that the toll is collected only on account of gasoline used "for the propulsion of motor vehicles upon highways" (P. L., c. 104, s. 7) is of consequence, as showing the nature of the charge.

So also is the provision that the charge does not depend upon the making of a sale, but is imposed, as far as possible, upon all that is used for the described purpose, whether sold or not (Laws 1927, c. 123). The reason for laying the charge is not that a sale is made, but because the fuel is to be used to propel cars over the highways. If the sale is for other uses the charge is not made. P. L., c. 104, s. 7. The sale enters into the computation only as a measure of the amount consumed upon the highways. It is not otherwise material to the demand that the charge be paid. Fuel so consumed without a sale thereof within the state is included in the calculation, in so far as the state can in any practicable way ascertain the amount so used.

It is manifest that it would be impracticable to attempt to collect a charge fixed upon this basis from motorists using on our highways gasoline delivered to them outside the state, and in process of use when the state is entered. And the known facts that other states collect a similar charge locally, but do not exact it for fuel taken into cars elsewhere but consumed locally, would justify an omission to attempt collection from such transient users of our highways, were it practicable to make the collection. The omission is justified as a reasonable measure of reciprocity.

In one aspect the situation resembles quite closely that presented by an imposition of wharfage, or other harbor charges, for the use of locally provided improvements, levied upon vessels according to tonnage. Objections to such levies were made upon the ground that by them the states were exacting charges for tonnage, in violation of the prohibition in the federal constitution (U. S. Const. Art. I, s. 10). But it has uniformly been held that charges so computed are not those prohibited by the constitution, that the substance of the imposition is a requirement of payment for the use of facilities provided, and that such charges may properly be measured by the tonnage of the vessel. 24 R. C. L. 1049, where the authorities are collected.

It is true that in *Carley* v. *Snook*, 281 U. S. 66, 74, it was said that the license fees there under consideration were in certain aspects marked "as demands of sovereignty not of proprietorship" and therefore likened to "taxes rather than tolls." The features of the charge laid which were stated as leading to that conclusion were: that it was not "exacted when and as the privilege of passage is exercised"; that it was "imposed generally upon all residents who use motor vehicles within the state, without reference to any particular highways or to the extent or frequency of the use"; and that it was "not exacted of non-resident automobilists passing through the state." These dis-

tinguishing features are almost wholly absent in the present instance.

While the charge is not made precisely when and as the privilege is exercised, in the sense that payment is made upon the spot and in the course of transit, in every practical view of the matter it amounts to the same thing. The motorist pays in advance for the right to travel and to subject the highways to wear and tear to the extent that the quantity of gasoline, by which the charge was measured, will propel his vehicle.

Payment in advance does not affect the nature of the charge. And it is the federal rule that a charge for use may be "based upon mileage, or otherwise." *Kane* v. *New Jersey*, 242 U. S. 160, 168. It is a matter of common knowledge that the heavier the car the greater its effect upon the road bed, (*Hicklin* v. *Coney*, 290 U. S. 169) and the more the fuel which will be consumed. It is believed that the charge per gallon of fuel used is the fairest measure yet devised of a uniform return for the use of highways. In these respects the charge in question is clearly distinguished from annual license fees. While the latter may go a small part of the way in equalizing the charge, by gradation according to weight, type of tires, etc., the more important feature of number of miles operated is of necessity there left out of the reckoning.

The charge is not made for the use of any particular road. But a charge for traveling a given number of miles on roads under state control, or more specifically for subjecting those roads to a given amount of destructive use, is none the less a charge for such use because it does not specify the particular portion of the system over which the privilege is to be exercised. There being a right to charge for the use, the nature of such charge is not changed because it gives the motorist a choice of uses, any and all of which might be charged for.

As before stated, the item of lack of relation between charge and frequency of use does not exist in this case.

The final distinguishing feature relied upon in the *Carley* case was that the fee was not required from non-residents. This feature also is lacking here. All are called upon to pay. The fact as to their residence is immaterial.

These important distinctions seem to lead to the conclusion that the charge here in question is, in all its substantial elements, one laid for the use of facilities furnished rather than a tax for the support of government.

The *Carley* case recognizes that even the charges there involved

are justified in other connections because of their similarity to "tolls for the use of highways." The case expressly excludes the idea that it decides that those charges are taxes in every aspect. The earlier cases, holding that they are properly laid upon interstate commerce because they are charges for use (*Hendrick* v. *Maryland*, 235 U. S. 610; *Kane* v. *New Jersey*, 242 U. S. 160; *Clark* v. *Poor*, 274 U. S. 554), are not questioned, but are impliedly recognized as sound. And in so far as the charges are there likened to taxes, the *Carley* case is not in point since the essential facts upon which that conclusion was based do not exist here.

Basically, and in every substantial aspect, the fee here in question is a charge for the use of highways. The situation which has arisen through the development of motor travel, and the succeeding demand for roads improved at great expense, has given rise to occasion for the states to demand direct contribution to those expenditures by the parties making use of the facilities provided. In acknowledgment of the justice of such charges, the federal court has given full recognition to the theory that the state, as well as an individual, may charge in a proprietary way for facilities so furnished.

In a very recent case the validity of similar charges, as being made for the use of facilities furnished, is again stated. In *Hicklin* v. *Coney*, 290 U. S. 169, an interstate carrier sought to avoid the payment of state license fees which were based upon the carrying capacity of his motor vehicles. The court, speaking through the chief justice, disposed of the contention as follows:

"Appellant insists that an undue burden is placed upon interstate commerce because the license fees are based on the 'carrying capacity' of the vehicles. The state court held that the fees 'are collected, as provided for by section 8517, for the purpose of maintaining the public highways over which such motor vehicles shall operate, as compensation for their use'. The statute provides for the segregation, for this purpose, of the moneys collected. See *Clark* v. *Poor*, 274 U. S. 554, 555-557. In this view the fees are not open to the objection raised in *Interstate Transit, Inc.* v. *Lindsey*, 283 U. S. 183, 186, 188. Carrying capacity, the size and weight of trucks, unquestionably have a direct relation to the wear and hazards of the highways. It is for this reason that the authority of the State to impose directly reasonable limitations on the weight and size of vehicles, although applicable to interstate carriers, has been sustained. *Morris* v. *Duby*, 274 U. S. 135, 143; *Sproles* v. *Binford*, 286 U. S. 374, 388, 389. As the State may establish such regulations directly, the State

may adjust its license fees, otherwise valid as being reasonable and exacted as compensation for the use of the highways, according to carrying capacity in furtherance of the same purpose. *Clark* v. *Poor, supra.*"

The present case thus stands upon the proposition that the state is making a reasonable, uniform charge for the use of its highways. It is a charge on a parity, so far as state authority is concerned, with the motor vehicle license fees which were upheld in *Hendrick* v. *Maryland*, 235 U. S. 610; *Kane* v. *New Jersey*, 242 U. S. 160, and *Hicklin* v. *Coney, supra.* It is in fact a more accurate adjustment of charge to the extent of use than those involved in the cases just cited.

Unless those cases are to be distinguished as inapplicable here, they should be decisive of the present controversy. The holding in those cases, and in the considerable body of authority preceding them, is that the immunity of interstate commerce from state interference does not go so far as to prevent the state from demanding a reasonable, non-discriminatory charge for the use of state owned facilities.

The reasons for this conclusion are set forth by *Brewer*, J., in *St. Louis* v. *Company*, 148 U. S. 92, 100, and quoted with approval by *Harlan*, J., in *Richmond* v. *Company*, 174 U. S. 761, 772. It was there said that federal franchises are subject to "the right of the individual not to be deprived of his property without just compensation. And the principle is the same, when under the grant or franchise from the national government a corporation assumes to enter upon property of a public nature belonging to a state. It would not be claimed, for instance, that under a franchise from Congress to construct and operate an interstate commerce railroad the grantee thereof could enter upon the state house grounds of the state and construct its depot there without paying the value of the property thus appropriated. Although the state house grounds be public property devoted to public uses, it is property devoted to the public uses of the state, and property whose ownership and control are in the state, and it is not within the competency of the national government to dispossess the state of such control and use or appropriate the same to its own benefit or the benefit of any of its corporations or grantees. This rule extends to streets and highways; they are the public property of the states."

There is of course a long line of federal cases, from *McCulloch* v. *Maryland*, 4 Wheat. 316, to *Panhandle Oil Co.* v. *Knox*, 277 U. S. 218, establishing and upholding the immunity of the federal government and its agencies from state taxation of any kind or to the slightest degree. There are also the decisions that local police regulations

cannot impede the operation of federal agencies. *Johnson* v. *Maryland*, 254 U. S. 51; *Arizona* v. *California*, 283 U. S. 423. It is our view that none of these authorities apply to the matter now under consideration. The authorities which do apply, and which we think should control the result upon this phase of the case, are those before referred to, upholding the right of a state to lay a reasonable charge for the use of facilities furnished.

The authority of these cases is not impaired by the circumstance that they involved the rights of interstate carriers rather than federal officials. The distinction between the limitations upon state authority to in some degree impose taxes or police regulations upon property used in interstate commerce, as contrasted with the usually absolute prohibition in the case of property of strictly governmental agencies, may be conceded. In *Panhandle Oil Co.* v. *Knox*, 277 U. S. 218, it was decided that a state excise tax upon the sale of gasoline could not be laid upon a vendor when selling to the United States; while in *Eastern Air Transport* v. *South Carolina*, 285 U. S. 147, like immunity was denied in the case of a sale for use in interstate commerce.

But the argument therefrom, that all charges against the federal government are invalid, and therefore all the reasoning in the interstate commerce cases is to be disregarded here, is plainly unsound. The reason for its invalidity is apparent. In so far as the interstate commerce cases involve questions touching the acts of a state in its sovereign capacity as a layer of taxes for the support of government or a regulator of conduct, the argument would be valid. But this case does not belong in either of those classes.

As decided in the *Hendrick* and *Kane* cases, and reaffirmed in *Clark* v. *Poor*, 274 U. S. 554, the charge for automobile licenses is not of that character, but rather a compensation for the use of property. Its imposition upon those engaged in interstate commerce was not justified upon the ground that it was a reasonable tax, affecting commerce only remotely. It was sustained as a payment demanded for the use of state property. These decisions do not rest upon a theory that there was merely an incidental interference with interstate commerce.

The conclusion did not depend upon the nature or extent of the immunity of interstate commerce from state control. Its basis is the proposition that the general government cannot take state property without compensation; and that if that government, or its representatives, desire to use state property without condemnation proceedings, they must do so upon the terms demanded by the state, in so far as the demand is reasonable.

In *Lindsay &c. Co.* v. *Mullen*, 176 U. S. 126, 154, in speaking of state boom charges, the court, through Mr. Justice *Brewer*, said that they "cannot be considered in any just sense a burden upon interstate commerce. It is nothing more than action upon the part of a State in furnishing additional facilities for the navigation of the waterway, and for such additional facilities reasonable charges may be exacted."

This fundamental rule has never been questioned, so far as we are aware. The only debatable question is whether the charge is of that character. Upon this question, decisions in cases involving alleged infringement upon the rights of interstate commerce are as pertinent as those relating to a charge directly against the general government. A charge cannot well be of one character when demanded of an interstate carrier, and of a different nature when required of a federal officer.

If a charge fixed by a state is "for the use of its highways by automobiles" (*Kane* v. *New Jersey*, 242 U. S. 160, 168), and therefore a demand of payment for the use of state property, when required of an interstate truckman, it is equally so when required from a postman or an army colonel.

Properly considered, there is, upon this branch of the case, no valid claim of federal right. It is not a situation where the general government has a right which cannot be infringed, and where the defence is that there is no substantial infringement. It is assumed for the purposes of the argument that the charge is demanded directly from a governmental agency. The answer is not that there is no cost to the agency, but that the charge is justified because of its nature. The defence here is not that the charge is too remote to be deemed an infringement of federal immunity. It is rather that there is no immunity.

This claim rests wholly upon the nature of the demand. Upon this issue, the interstate commerce cases are pertinent. As those decisions are founded upon the fact that the permitted demand is a charge for the use of facilities furnished, it must follow that it is the federal law that such charges are of that character.

Although charges similar to the one here involved have sometimes been referred to in the federal decisions as taxes, it is apparent that they do not possess the characteristics of such an imposition which would render them invalid as against federal agencies. This is made clear by the federal decisions. It is held that these charges cannot be more than a reasonable compensation for the specific privileges granted. *Interstate Transit, Inc.* v. *Lindsay*, 283 U. S. 183.

In the same case it was said: "But since a State may demand of one carrying on an interstate bus business only fair compensation for what it gives, such imposition, although termed a tax, cannot be tested by standards which generally determine the validity of taxes. Being valid only if compensatory, the charge must be necessarily predicated upon the use made, or to be made, of the highways of the State." *Ib.* 190.

It is rightly held that the name given by the state to the charge demanded is immaterial to the federal issue of the validity of the charge. It must be equally true that the name applied to the charge by the federal court is likewise immaterial. The real test in all cases is, in the language before quoted, "what the statute does." Two fundamental ideas expressed in *McCulloch* v. *Maryland*, 4 Wheat. 316, are believed to furnish all the general rules for testing the validity of demands by the local from the general government. The charge must not interfere with the performance of the functions of the general government, and it cannot call upon that government to bear the expenses of the local government.

Neither of these propositions affords any ground for a conclusion that the state may be called upon to furnish gratis to the nation anything for the use of which it is entitled to compensation from all others. Equal treatment is of course required. Beyond that, any requirement that the state give free or exceptional service to the nation, would be to deny to the state the protection from federal imposition of precisely the same character as that condemned when attempted by state legislation against the general government.

If this is true, it is entirely immaterial how the charge is described in the enacting statute, or what name has been applied to it in federal decisions. The issue is what it does. It having been federally determined that this statute does not go beyond a demand of compensation for facilities furnished, it is not a tax, in the sense of a burden put upon federal activities. Nor is it a demand that the general government contribute to the support of the state.

To put it in everyday phrase, it is a claim that the general government should pay for what it wishes to buy or use. Vast as the powers of the general government are, they do not include a right to confiscate where there is no offense. It cannot appropriate the property of a state, any more than it can quarter soldiers upon the individual citizen in times of peace.

These conclusions do not depend upon any theory of state sovereignty. They result from a denial of national absolutism. They

are not maintained upon a plea that a state is clothed with rights or endowed with powers peculiar to itself. That feature of our dual form of government is put aside. That a state is an entity, entitled to the fundamental rights, privileges and immunities belonging to every legally recognized entity, is all that is here claimed. Nothing is demanded on behalf of the state which would not be granted without question at the behest of the humblest citizen.

In its final analysis the case has to do with a plain business proposition. The state says to all alike: if you wish to use that which I offer for your use, you must pay the reasonable price which I ask for such use. Like the turnpike proprietor, the state is here a public servant, bound to treat all alike. But also like him in its collection of compensation—it is not a tax gatherer.

The suggestion that the maintenance of public highways is a governmental function does not alter the fundamentals of the situation. Granting that it partakes of that character, it still remains true that a charge may be collected for the use of facilities furnished by the state. Not all public facilities are furnished to individuals free of charge.

The fact, if it were a fact, that highways are provided by the state in the exercise of a purely governmental power, would not deprive the state of authority to make a reasonable charge for their use. Nor does the circumstance that they are furnished by the state rather than by a private corporation give the federal government any preferential right to use them.

While the agents of the federal government are exempt from state interference with the discharge of their federal functions, they have no warrant to demand from the states any form of free service of a class for which all others must pay. The fact that a state may be acting in a governmental capacity does not authorize the general government to demand the fruits of such activities. The federal government has no more right to demand free service from an individual state than from an individual man.

The charge here demanded is payable by the plaintiff, whether he is or is not to be regarded as representing the federal government in the purchase of gasoline. The demand being for no more than reasonable compensation for the use of the highways, it is payable by the United States as well as by all others.

II. If, contrary to the foregoing views, the charge here laid should be held to be a tax under the federal law, the further question would arise as to whether it constitutes a burden upon the activities of the

federal government. The issue, as hereafter pointed out, is one of degree. "All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached. ... The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side. ... It constantly is necessary to reconcile and to adjust different constitutional principles, each of which would be entitled to possession of the disputed ground but for the presence of the others." *Holmes, J.,* in *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 355, 357.

At some point the interference becomes too remote to warrant an application of the immunity which has been implied from the sovereign nature of the federal government. When that point is reached, the power of the state prevails. Unlike the issue presented under the first claim of the state, the question here is one of competing governmental rights. Cases involving this matter have arisen in a great variety of instances and the decisions are very numerous.

There has been not a little of change in the viewpoint and the reasoning adopted by the court from time to time. In the earliest case (*McCulloch* v. *Maryland,* 4 Wheat. 316) the test declared was whether the tax was upon a federal agency. This was followed for a considerable period. "Many decisions with respect to the taxing power of the states have proceeded on the theory that inquiry need be directed only to the characteristics of the subject matter on which the tax is levied. If the subject is an instrumentality of the federal government, the state tax is invalid as an interference with the necessary effectiveness of that government. If the subject is not an instrumentality of the federal government, the tax cannot be held invalid as an interference with that government. If the subject matter is interstate commerce, the state tax is invalid as a regulation of such commerce. If the subject matter is not interstate commerce, the tax cannot be a regulation of such commerce. Such are the conclusions which find warrant in the language of many of the judges of the Supreme Court. But an examination of the decisions shows that the line of demarcation between valid and invalid state taxes is not so clear and straight as this language implies." Thomas Reed Powell, in 31 Harv. Law Rev. 322.

"The press of economic facts has forced Marshall's successors to abandon his theory that a state may levy any tribute it pleases on a subject not immune from its taxing power. Taxes on subjects within the power of the states have been held invalid as regulations of interstate commerce, for the reason that the measure adopted for determining their amount took toll from interstate commerce. . . .

"This change of doctrine has thus far been confined to the field of interstate commerce. It has not yet been applied to state taxes on proper subjects which nevertheless tap the value contributed by federal securities. But logically the new principle is as relevant to economic burdens on the federal borrowing power as to those on interstate commerce." *Ib.*, 325.

Powell was writing in 1917. Since that time there have been numerous attempts to apply this theory, not only to federal securities, but also to taxation of the property of individuals, used by them in the performance of federal duties. Impetus was given to such litigation by a decision rendered in 1928. *Panhandle Oil Co.* v. *Knox*, 277 U. S. 218. It was there decided that a state could not lay a sales tax, payable by the seller, upon gasoline sold to the United States for governmental use. This conclusion was based upon reasoning that while a state may impose a tax upon a dealer for "carrying on trade that is subject to the power of the State" it cannot lay a tax upon sales to the United States by which it "secures the things desired for its governmental purposes." "It is immaterial that the seller and not the purchaser is required to report and make payment to the State. Sale and purchase constitute a transaction by which the tax is measured and on which the burden rests. . . . To use the number of gallons sold the United States as a measure of the privilege tax is in substance and legal effect to tax the sale. . . . And that is to tax the United States—to exact tribute on its transaction and apply the same to the support of the State." *Ib.*

These views were adopted by a bare majority of the court. Their weaknesses are fully discussed in the dissenting opinions in that case and a later parallel decision. *Indian Motorcycle Co.* v. *United States*, 283 U. S. 570. While the decision is to be treated as the federal law, it is not a case which indicates that the logic advanced in its support will be extended. We think it is not applicable here because the situation is substantially different, and there is nothing to indicate that it is to be used as a precedent for further extensions of federal immunity.

In the present instance difference is found in other respects than

the greater remoteness. The more fundamental distinction lies in the comparative character of the purchasers. In the *Panhandle* case it was held to be the government itself; while here it is a person who to a limited extent only occupies the status of a governmental agent.

The plaintiff in this case is called upon to furnish his own transportation, for which he receives a small allowance. That allowance is at a fixed sum per mile of travel. It does not depend upon how much or how little the cost of such transportation may be to him. It is clear that the circumstances put the situation farther away from any interference with governmental activities than the *Panhandle* case. The tax there in question was held to be invalid upon the ground that it directly increased the cost of government. In the language of the opinion the result was "to tax the United States." There is no such element here.

The charge is not laid because the gasoline is to be used by a federal agency. It is of course true that a discriminatory charge, imposed upon such grounds, would be invalid. But there is no discrimination. The charge is not made because the plaintiff is to carry the mail, but because he is to operate an automobile upon the highways of the state. The plaintiff, in his capacity of purchaser of automobile fuel, stands like any other individual. He has not even been a purchaser intending to use the fuel solely in the performance of his official duties. It was conceded at the argument that he uses his car for private driving as well as in the delivery of mail.

A holding that this charge is invalid as one laid upon a federal agency would lead to rather extreme results. Officers of the army are given a sustenance allowance. U. S. C. A., Tit. 37. If the theory here advanced were sound, all their domestic supplies would be free from the sales taxes now laid in many states. The same would be true of all other federal officers or agencies who have any form of allowance. And it is but a step beyond, as pointed out by Judge *Holmes* in the *Panhandle* case, to conclude that all salaried federal officials are entitled to like immunity.

While the freedom of the federal government from state taxation must be upheld, it does not seem to us that the theory is capable of rational extension so far as to include the present case within its scope. A conclusion of immunity from this charge could be sustained only by saying that such increased cost of operation to the carrier will have the effect of requiring the federal government to increase in the future the salary or allowance of its carriers. As above suggested, the same argument would extend immunity from a great variety of

charges to a multitude of federal officials. And a like immunity for state agencies from many forms of federal taxation would follow as a matter of course.

The argument applies, not only to sales to federal agencies, but to all persons having government contracts. If their purchases of materials and supplies are subject to a state tax, they must get more money for their product from the general government. No one suggests that this element is sufficiently related to governmental activities to warrant a claim of exemption. Its efficiency to create an exemption when there are sales by the government has been denied in terms. *Group No. 1, Oil Corp'n.* v *Bass*, 283 U. S. 279. The line is somewhere between such a case and one of a direct purchase by the government. It seems to us that it should not be extended beyond the holding in the *Panhandle* case. Where the sale is not to the government, but to some agency required by law to furnish the purchased article at his own expense, there should be no exemption.

In the present case there was no sale to the government. The article purchased never became property of the government. It was the plaintiff's property, which he was at liberty to use as he saw fit. Its procurement was his affair. It was immaterial to the government whether he paid a large or small price for it, or whether he procured it as a free gift.

It appears to us that the theory upon which the *Panhandle* case was decided is at best of doubtful validity. As pointed out by Mr. Justice *Holmes*, its basis is the unsound declaration in *McCulloch* v. *Maryland*, 4 Wheat. 316, that the power to tax is a power to destroy. But granting all that has been said in favor of that declaration, it still remains true that limitations upon the taxing power are now unhesitatingly applied by courts in cases where authority to lay taxes exists. This feature of the situation is of consequence as a reason why the governmental immunity should not be unduly extended.

The effect of this judicial power to determine whether taxes are confiscatory, or discriminatory, or even a substantial burden, as an element in ascertaining whether the state power to tax has been exceeded, has come to have full recognition in cases where the issue was one concerning interference with interstate commerce. In principle, there is no reason why it should not also influence the conclusion in cases like the present, involving governmental agencies.

The doctrine of federal immunity invocable in behalf of federal agencies includes a classification of such instrumentalities. These may be purely governmental agencies, created by federal legislation

and having no functions separable from that character. National banks are by federal law deemed to be of that class. As to them, the rule of federal immunity applies to all property held or acts done; since they can neither hold property nor do acts in any other capacity.

But there is also another class of federal agents, who have an existence outside their federal functions. As to these, it is not enough to show that they hold property or do acts. To invoke the federal immunity they must make it appear that the holding or acting which is burdened by the tax is in the federal capacity.

It may be that this distinction is not stated in terms in the decided cases, but the authorities hereinafter cited appear to establish its existence. It has developed with the growth of the theory of incidental interference with governmental activities. It is a necessary part of that theory. The desired immunity is here sought in a factor other than direct taxation of a governmental agency. The claimants must therefore go beyond proof that the subject is taxed. The subject, not being generally immune, something more must be shown. Indirect interference with federal functions is relied upon and must be established. It is evident that upon such an issue the matter of degree becomes highly important. The test of any imposition, however slight, is not applicable to this feature of the problem.

In these cases of private property used by a federal agency in the course of the performance of federal functions, there is room for the application of the test applied in the interstate commerce cases. The inquiry whether the levy is a substantial burden upon the federal activity is a subject for investigation in the same way that levies which indirectly concern interstate commerce are dealt with.

The distinction sometimes drawn between interstate commerce and federal agency cases, by the application of the theory that the state cannot tax a federal agency in any way or to the slightest degree, does not answer the foregoing proposition; because absolute immunity from state taxation applies only to federal possessions or those held in a federal capacity. When one goes outside that field to consider claims for immunity based upon an allegation that the thing taxed is related to, rather than a part of, federal possession, the claim for absolute immunity does not apply. Remoteness and amount are then used to aid in the solution of the problem of interference with federal power. The rule ceases to be one of absolute exclusion, and economic considerations have a part in the ascertainment of results. This is clearly illustrated by several recent cases.

In *Alward* v. *Johnson*, 282 U. S. 509, a state tax was imposed upon

the gross receipts of a stage line. Those receipts consisted of passenger and freight charges of about $18,000, and $42,000 received under a contract for carrying the United States mail. It was decided that there was no federal exemption on account of the use of property to carry the mails. "There was no tax upon the contract for such carriage; the burden laid upon the property employed affected the operations of the Federal Government only remotely." *Ib.*, 514. It was further said that the principles applied in the *Panhandle* case were "not controlling here." This case comes close to the problem in hand.

In *Wheeler &c. Co.* v. *United States*, 281 U. S. 572, there was a federal tax upon the transportation of lumber, which had been sold to a county and was to be delivered by the vendor. It was decided that the tax could not be regarded as a burden upon the sale. "The tax is not laid on the sale nor because of the sale. It is laid on the transportation and is measured by the transportation charges. True, it appears that here the transportation was had with a view to a definite sale; but the fact remains that the transportation was not part of the sale but preliminary to it and wholly the vendor's affair." *Ib.*, 579. So here the sale was independent of the federal use the purchaser proposed to make of the commodity purchased. The tax was not here laid for a permit to use the fuel in the discharge of the purchaser's duty to the federal government.

In *Willcuts* v. *Bunn*, 282 U. S. 216, 226 it was said: "No constitutional implications prohibit a non-discriminatory tax upon the property of an agent of government merely because it is the property of such an agent and used in the conduct of the agent's operations and necessary for the agency." There is no immunity "where no direct burden is laid upon the governmental instrumentality, and there is only a remote, if any, influence upon the exercise of the functions of government." *Ib.*, 225; *Fox Film Corporation* v. *Doyal*, 286 U. S. 123, 128.

"There is a recognized distinction between a non-discriminatory tax upon the property of an agent of government, albeit the property is used in, or has relation to, the business of the agency—where there is only a remote, if any, influence upon the exercise of the functions of government—and a tax which is deemed to impose a direct burden upon the exertion of governmental powers." *Hughes*, C. J. in *Indian Territory &c. Oil Co.* v. *Board of Equalization*, 288 U. S. 325, 327, 328.

It may be said that the rule of absolute federal immunity still applies in full vigor in all cases; that the foregoing argument misses the

point, in that denial of immunity still depends, in every case, upon lack of effect upon a federal agency, rather than upon remoteness of the burden; that such remoteness is material only as it shows lack of agency, or that the agency is not taxed. This may be true of the earlier cases, which dealt with this issue of taxation solely from the viewpoint of the subject upon which the tax was laid. For a long time "The question is treated as one of power and not of economics." Powell, 31 Harv. Law Rev. 575. The more recent decisions have not been so limited. These late cases have opened a broader field. The economic factor is also taken into account. The inquiry is extended to include the issue whether the tax, though not laid upon a governmental instrumentality, yet in its practical operation amounts to a direct burden thereon. In such an investigation, full recognition is given to remoteness of burden as an element in ascertaining the validity of the tax.

With the introduction of the less definite economic factor as a test for interference with governmental functions, the issue of degree became a part of the problem to be solved. The test is necessarily less definite than the more obvious one which dealt with the matter on the basis of the subject upon which the tax was laid. The tax not being laid upon the governmental agency, and affecting the operation thereof only indirectly, some test for the sufficiency of effect must be found. It is here that the rule that the effect must be substantial has been applied. This appears to be upon the theory that unless it is substantial the tax cannot be said to fall upon the agency, and therefore, it is said, the rule against any tax at all thereon is observed.

But it is not very important here which way the proposition is stated. The practical result is the same whether it is said that taxes upon private property used by the agency are valid unless they constitute a substantial burden upon the governmental activity, or that such a tax, when discriminatory or imposing an unreasonable economic burden, is in reality one laid upon the agency, and is for that reason invalid under the rule of absolute immunity. In either event, remoteness of effect—the economic factor—enters into the solution of the problem. It is this feature which brings the cases into rational accord with those involving interstate commerce.

The test stated in the foregoing authorities is in all respects comparable with that applied in the interstate commerce cases. While it is sometimes said that a state may impose a reasonable, non-discriminatory tax upon those engaged in interstate commerce, the more understandable statement of the rule is that the state cannot tax

such commerce at all. *Robbins* v. *Shelby &c. District*, 120 U. S. 489. If a tax is upon interstate commerce, as such, it is invalid. This is not primarily because the classification is too narrow to be sustained, if there were no other objection. It is invalid because of the lack of state power to tax the class.

But taxing things used in interstate commerce is not *per se* taxing the commerce. Unless the incidence of the tax is made to depend, in some degree, upon such use, the state power is not exceeded. The state may tax things used in interstate commerce as it taxes other like things. This is not taxing interstate commerce.

In the case which laid the foundation for the theory of federal immunity, a like power as to the possessions of a federal agency was declared. "This opinion does not deprive the States of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the State, nor to a tax imposed·upon the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the State. But this is a tax on the operations of the bank, and is, consequently, a tax on the operation of an instrument employed by the government of the Union to carry its powers into execution." *McCulloch* v. *Maryland*, 4 Wheat. 316, 436, 437.

The line was there plainly drawn between a tax upon, and because of, federal operations, and one upon things as such. While this distinction has come to be quite fully recognized in the interstate commerce cases, and in cases of incidental federal use, it has not been in the case of purely federal agencies. Non-taxability of the corporeal property of institutions which are deemed to be strictly federal agencies, even when operated mainly for private gain, as in the case of national banks, is now an accepted federal doctrine. The states furnish protection for such property, but they cannot tax it, save by virtue of a federal act of grace. *Des Moines National Bank* v. *Fairweather*, 263 U. S. 103.

Yet the essential rightness of the claim to contribution persists. Such state taxation, without the destructive power wrongly attributed to it in *McCulloch* v. *Maryland, supra,* is based upon an inherent justice which is not obliterated by a denial of its sufficiency to overcome countervailing considerations in certain situations. Whenever a case arises which is close to the line dividing federal and state power, the argument continues to be one entitled to consideration.

However little weight such considerations have in cases where there

is an attempt to tax nationalized property, they are certainly entitled to be weighed when the situation is not of that character. If, as in the case at bar, there is no absolute prohibition, and the matter is one of degree, or collateral effect, such just and reasonable factors are entitled to a place.

The theory that property of a federal agency is immune from state taxation, regardless of the amount or nature of the tax, is only applicable to cases where the property is held in that capacity. The recent cases referred to above seem to recognize this distinction. Property of an individual, although used in the performance of a federal duty, and even though essential to such performance, is not exempt from state taxation because of the use made of it. As on one hand it cannot be taxed because put to a federal use, so on the other hand it is not exempt from taxes whose incidence depends upon other factors. In short, the federal use cannot be taxed, but the property is taxable.

This puts such cases substantially upon the same basis as that used in those involving interstate commerce. If this is a correct appraisal of the situation, it follows that the interstate commerce cases are not only persuasive but also controling here. This is not an instance of taxation of the property of a federal agency, such as a national bank. The property here involved is taxable. The sole objection is that there is taxation upon a federal use, or that an unreasonable burden is put upon that use. It is the same objection that is urged in the interstate commerce cases; as to which the federal decisions have settled the law in favor of the state power to tax.

The problem is one of degree. It involves a consideration of the particular facts of the individual case. The recent cases before quoted give the general rules for guidance in arriving at results in a case in hand. In such a state of the law, conclusions will differ with difference of circumstance. It is only the decision which is strictly "on all fours" which is controling. "We must still seek the law in the concrete decisions, and not in the general statements." Powell, 31 Harv. Law Rev. 618. Such a decision has been rendered.

In a recent case involving a state tax upon sales of gasoline, the plaintiff claimed exemption upon the ground that the fuel was for use in airplanes engaged in interstate commerce. The decision and the line of reasoning seem pertinent and controling in the present litigation. Chief Justice *Hughes* said: "Undoubtedly purchases of goods within a state may form a part of transactions in interstate commerce, and hence be entitled to enjoy a corresponding immunity. But the mere purchase of supplies or equipment for use in business

which constitutes interstate commerce is not so identified with that commerce as to make the sale immune from a non-discriminatory tax imposed by the state upon intrastate dealers. There is no substantial distinction between the sale of gasoline that is used in an airplane in interstate transportation and the sale of coal for the locomotives of an interstate carrier, or the locomotives and cars themselves, bought as equipment for interstate transportation. A non-discriminatory tax upon local sales in such cases has never been regarded as a direct burden upon interstate commerce and has no greater or different effect upon that commerce than a general property tax to which all those enjoying the protection of the state may be subjected." *Eastern Air Transport* v. *Commission*, 285 U. S. 147, 153.

The case appears to us to be squarely in point here. In the before quoted language of Mr. Justice *Holmes*, it is a point along the line and determines "that this . . . concrete case falls on the nearer . . . side."

This conclusion does not conflict with the decision in the *Panhandle* case; for there the transaction taxed was one directly with the government. There was no issue as to the limitation upon immunity for the property of a governmental agent, for there was no such intermediary. If the tax was in any way against the purchaser, it was imposed upon the government in a direct fashion. Here the purchase was by one who was a governmental agency to a limited extent only. In carrying the mail he was such agent. In providing for his transportation he was not such agent. The sale upon which the tax was laid was made to him in the latter capacity. He had no authority to buy gasoline for the United States. His federal duties did not include such purchase. No one would doubt that his automobile was subject to a local property tax; and, in the language just quoted, the tax upon his motor fuel was comparable, as to its validity, with a general property tax. "Unquestionably" the state "is free to tax the machinery, . . . that are used for the performance of the contracts. These things are as closely connected with the work as is the gasoline in respect of which is laid the excise in question. There is no room for any distinction between the plant so employed and the gasoline used to generate power." *Trinityfarm Construction Co.* v. *Grosjean*, 291 U. S. 466.

Theories of exemption, which were originally declared to be limited to cases where there was a plain attempt to regulate or burden governmental endeavor, have been revised in the *Panhandle* case until they are made to include instances where there was no such attempt, but merely a demand that when the government enters the market

place it shall claim no special favors. That enlargement of immunity is rightly regarded as going to great lengths. The further extension sought in this case is not indicated by anything the federal court has decided or said up to the present time.

Two other often repeated reasons for denying further extensions of immunity may be briefly stated.

The rapid extension of both national and state governmental activities into new fields necessarily creates increasing needs for new revenue. Absorption of new lines of endeavor by the government reduces the field from which taxes may be gathered.

In order to prevent escape by individuals from taxation, on the specious plea that somehow or other the taxes will ultimately come out of the government, the governmental immunity may well be kept within bounds.

In view of the recent decisions, and of the reasons for not extending immunity from taxation beyond burdens which are direct and borne by government in practice as well as in theory, we conclude that, if the charge here demanded were to be treated as a tax laid by the state in its sovereign capacity, it would not be invalid as an infringement upon federal immunity from state interference.

*Case discharged.*

All concurred.